951 A.2d 947

CAROLE BRUNDAGE, PLAINTIFF–APPELLANT, v. ESTATE OF CARL V. CARAMBIO, DEFENDANT–RESPONDENT.

Argued April 8, 2008—Decided July 15, 2008.

576

578

*Patrick T. Collins* argued the cause for appellant (*Franzblau Dratch,* attorneys).

*David Jay* argued the cause for respondent (*Greenberg Traurig,* attorneys; *Mr. Jay* and *Helen E. Kleiner,* on the brief).

*David H. Dugan, III,* argued the cause for amicus curiae New Jersey State Bar Association (*Lynn Fontaine Newsome,* President, attorney).

Justice HOENS delivered the opinion of the Court.

In this appeal, we are called upon to consider the intersection between zealous representation of one's client and an attorney's obligations of candor to a tribunal. More to the point, we are called upon to consider the scope of the authority of the courts to visit upon a client the burden of a penalty imposed because of his or her attorney's violation of that obligation of candor.

The facts and circumstances that bring this matter before the Court are in some ways truly unique because, merely by the happenstance of timing, the effect of the attorney's behavior, even if we were to find that it violated our ethical standards, could not have affected the outcome of the litigation. Although we regard this attorney's behavior as worthy of reproach, in the end we cannot conclude that he violated his duty of candor to the trial court or to the Appellate Division. More to the point, however, we cannot endorse the decision of the appellate panel to visit punishment for the attorney's behavior on his entirely innocent client.

We reach our result today with some reluctance, however. But for the fact that the point of law that was central to the parties' dispute, and that became the lynchpin for their decision to settle, has now been decided by this Court in favor of the attorney in question, his behavior might otherwise have worked to provide an unfair advantage for his client. Nevertheless, our strong sense of

the requirements of justice demands that our ethical rules be enforced vigorously, but not without attention to their content and purpose; that those rules be enforced by this Court through the disciplinary mechanisms we have established; and that punishment for violations of those rules fall, with exceedingly rare exceptions, on the offending attorney rather than upon his or her client.

Applying these standards, we cannot escape the conclusion that this attorney's behavior, although certainly calculated to work an advantage for his client based on information that was uniquely his, approached but did not exceed the bounds of acceptable behavior identified by our ethical rules. As such, it was a course of conduct that we neither applaud nor encourage, but nevertheless, one that our rules do not prohibit. In that context, imposing a litigation sanction upon his client cannot be condoned.

## I.

We begin with a recitation of the facts that give rise to this dispute, focusing, as we must, on the facts as they relate to the acts of plaintiff's attorney, Patrick T. Collins.

## A.

Prior to the filing of the complaint in this litigation, Collins represented one Jeanette Levine. She was the plaintiff in an action pending in Essex County in which the critical issue was whether cohabitation was an essential element of a palimony claim. *See Levine v. Konvitz,* 383 *N.J.Super.* 1, 890 *A.*2d 354 (App.Div.), *certif. denied,* 186 *N.J.* 607, 897 *A.*2d 1061 (2006). In June 2004, the Family Part judge in the *Levine* matter issued an unpublished decision granting defendant's motion to dismiss the complaint that Collins had filed on behalf of Levine. The Essex County judge, after considering this Court's rulings relevant to that novel question of law, *see In re Estate of Roccamonte,* 174 *N.J.* 381, 808 *A.*2d 838 (2002); *Crowe v. De Gioia,* 90 *N.J.* 126, 447 *A.*2d 173 (1982), concluded that because the cause of action rested

on the existence of a marital-type relationship, no palimony claim could proceed without evidence of cohabitation. Collins filed an appeal in that case, raising the question of "whether cohabitation is an indispensable element of a cause of action seeking palimony support." *Levine, supra,* 383 *N.J.Super.* at 2, 890 *A.*2d 354.

While that appeal was pending, plaintiff Carole Brundage retained Collins to represent her in a palimony claim to be filed against defendant Estate of Carl Carambio. In October 2004, Collins filed the complaint on behalf of Brundage in the Family Part in Union County. Like Levine and the defendant in the Essex County matter, Brundage had not cohabited with Carambio at any time during the course of their relationship. Brundage asserted that although they never resided in the same household together, beginning in 1991 and continuing until Carambio's death, they dined and spent weekends together frequently, traveled on numerous vacations together, and regularly enjoyed recreational activities. In addition, Brundage alleged that Carambio was generous to her, showering her with gifts, supporting her lifestyle, and providing her with a credit card for her use. Moreover, she contended that she cared for Carambio throughout most of his final illness in place of his family members, who only interceded near the very end of his life.

As a part of plaintiff's claim, she alleged that Carambio had made an oral promise to support her for the rest of her life and had instructed his attorney to draft changes to his estate plan to effectuate that promise, but that his wishes had been thwarted by his spouse and children who had prevented him from executing the revised will during his last days of life. Brundage argued that, notwithstanding the failure of the parties to engage in cohabitation, those facts evidenced a promise sufficient to support a right in contract that survived Carambio's death as a claim against his estate.

### B.

Following discovery, in April 2005, the Estate moved to dismiss the complaint, arguing that cohabitation was an essential element

of a palimony cause of action and that plaintiff's stipulation that the parties had never cohabited was fatal to her complaint. In opposition to that motion, Collins filed a brief in which he argued, as a matter of law, that cohabitation was not an essential element of the cause of action. Although that argument was consistent with the position Collins had taken in the *Levine* case, he did not disclose to the trial court the existence of that other matter, or that the Family Part judge in the *Levine* case had decided the issue against him, or that the question was then pending on appeal.

Instead, in his opposition brief, counsel included four statements that have since become the focus of these proceedings. First, he asserted that "no New Jersey case has held [cohabitation] to be a requirement for the enforceability of [a palimony] agreement." Second, he wrote that "nowhere has there been articulated in any reported decision in New Jersey a rule of law to the effect that in order for [a palimony] agreement to be enforceable, it is necessary that the parties live in the same residence and/or hold themselves out to be husband and wife." Third, he emphasized that "no reported decision in New Jersey has held that the absence of the sharing of a single residence by the parties to [a palimony] agreement renders it unenforceable." Finally, counsel maintained that if the Family Part judge in this matter held that cohabitation . was an essential element of a palimony cause of action, the court would "do so in the absence of any New Jersey precedent."

## C.

In July 2005, after hearing oral arguments, the Family Part judge denied defendant's motion to dismiss. That judge, like his counterpart in Essex County, analyzed this Court's decisions in *Roccamonte* and *Crowe*, as well as other decisions called to the court's attention, in order to discern whether any of them included a requirement of cohabitation as a prerequisite for a palimony claim. The Family Part judge in this matter, however, reached a conclusion different from the judge in *Levine*. The judge in this

matter concluded that the language in *Roccamonte,* defining the parameters of the cause of action, did not evidence an intention to exclude individuals who had all of the indicia of a promise of support sufficient to bespeak a contractual agreement, absent only a period of cohabitation. Recognizing that the issue was not settled and commenting that the Supreme Court might well one day answer the question differently, the Family Part judge concluded that there was a sufficient factual basis on which to deny the motion to dismiss.

Defendant then filed a motion seeking leave to pursue an interlocutory appeal. In opposing that motion, plaintiff's counsel did not disclose to the Appellate Division judges to whom the motion was assigned either the contrary conclusion of law reached by the judge in the unreported *Levine* decision or the fact that an appeal from the final order in *Levine* was pending. Rather, in his opposition brief, Collins reiterated that "nowhere has there been articulated in any reported decision in New Jersey a rule of law to the effect that in order for [a palimony] agreement to be enforceable, it is necessary that the parties live in the same residence and/or hold themselves out to be husband and wife." Counsel also again asserted that if the court held cohabitation to be an essential element of palimony, the court would "do so in the absence of any New Jersey precedent," and that defendant's position "is not supported by any reported law...." In August 2005, the Appellate Division denied defendant's motion for leave to appeal.

In October 2005, the parties reached a settlement. The record reflects that the Family Part judge participated in the negotiations that ultimately resulted in the settlement, and that at no time during that process did plaintiff's counsel advise the court or his adversary about the *Levine* case or the pending *Levine* appeal.

Although the dispute between Brundage and defendant was settled, the terms were not recited on the record or reduced to writing. However, the parties do not dispute that defendant agreed to pay plaintiff the sum of $175,000 by February 1, 2006, a date that was selected in order to give defendant time to arrange

for the sale of a business that would be the source of the funds for the settlement. Prior to that date, counsel for the parties exchanged letters about the settlement and continued to discuss an issue, relating to responsibility for the payment of inheritance taxes on that sum, which previously had not been finalized. When the February 1 deadline arrived, the deal to sell the business had not closed and defendant concluded that it could delay payment pending that sale by withholding signature on the draft of the written settlement agreement that had been sent by plaintiff's counsel. As a result, defendant did not tender any part of the payment promised in the settlement by February 1, the agreed-upon date.

### D.

On February 6, 2006, the Appellate Division published its decision in *Levine, supra,* holding that cohabitation is an essential element of a palimony action. 383 *N.J.Super.* at 1, 3, 890 *A.2d* 354. Upon learning about the *Levine* decision, defendant discovered that Collins had also represented that plaintiff and therefore promptly moved to rescind, terminate, or estop plaintiff from enforcing the settlement based on a theory of concealment of a material fact or anticipatory breach. In analyzing that claim for relief, the same Family Part judge who had earlier presided over the matter and had participated in the settlement discussions began by considering the favored role that settlements play in our system of justice. He recognized that our rules ordinarily require that settlement agreements be enforced, absent fraud or similar circumstances, and concluded that nothing in the record supported relief.

In reaching that conclusion, the court reasoned that the unpublished Family Part decision in *Levine* would not have been binding precedent upon him and therefore that neither the existence of that decision nor the fact that there was a pending appeal of that decision was required to be disclosed. The Family Part judge further concluded that both materiality and detrimental reliance

are elements of fraud that would need to be demonstrated to support setting aside the settlement, and that defendant was not entitled to relief because it had proven neither.

Reasoning in the alternative, the Family Part judge concluded that even if Collins had perpetrated a fraud, there was no basis on which to attribute that act to his client as a matter of agency law and therefore no ground on which to set aside the settlement reached between the parties. Suggesting as well that counsel for defendant bore some responsibility to keep abreast of matters of interest that are pending before the Appellate Division, the court found that defendant's counsel also played a role in the settlement by failing to be aware of the pendency of the *Levine* matter. Finally, the court recognized that the factors that play a part in the decision of any litigant to settle are many and varied, and reasoned that there was no evidence that Collins's silence about the contrary position taken by the trial court in *Levine* had any direct relevance to the decision to settle in this case.

## E.

The Appellate Division saw the matter differently and reversed. *Brundage v. Estate of Carambio,* 394 *N.J.Super.* 292, 303, 926 *A.*2d 395 (App.Div.2007). In its published decision, the court analyzed the dispute as being one of a lawyer's professional responsibility as it relates to candor to the tribunal. As the Appellate Division put it, however, the issue on appeal was both a very narrow one, and one that was focused only on the attorney's duty to the appellate tribunal, namely

> whether a lawyer, in the context of opposing a motion for leave to appeal, has a duty to disclose the existence of a pending appeal in which the lawyer is counsel of record, when the pending appeal involves the identical legal issue the appellate tribunal is being asked to consider in the motion for leave to appeal.
>
> [*Id.* at 294, 926 *A.*2d 395.]

Relying on the obligations imposed on attorneys by the *Rules of Professional Conduct (RPCs )*, the panel concluded that defendant would be entitled to relief if the existence of a pending appeal could be defined as a material fact. *Id.* at 297, 926 *A.*2d 395.

Turning to that inquiry, the panel concluded that because the Case Information Statement (CIS) that must be filed in connection with an appeal, *see R.* 2:5–1(a), requires disclosure of existing similar appeals, and because the efficient administration of justice demands coordination of matters on appeal, public policy would have militated in favor of granting the motion for leave to appeal had the existence of the *Levine* appeal been disclosed. *Id.* at 298–99, 926 *A.*2d 395. That being the case, the panel concluded that the existence of the *Levine* appeal was a material fact, thus creating an ethical duty for counsel to disclose it, which duty the panel concluded Collins violated. *Brundage, supra,* 394 *N.J.Super.,* at 299–300, 926 *A.*2d 395.

Turning to an analysis of the appropriate form of relief, the panel concluded that "an attorney is under a duty, when the proper administration of justice so requires, to disclose all pertinent and relevant facts to the court so that it may act fairly." *Id.* at 301, 926 *A.*2d 395 (quoting *In re Seelig,* 180 *N.J.* 234, 248, 850 *A.*2d 477 (2004)). The court then reasoned that plaintiff's counsel's silence directly impacted defendant. *Id.* at 302–03, 926 *A.*2d 395. In the panel's view, if the *Levine* appeal had been disclosed, defendant might have awaited its outcome before agreeing to a settlement or might have used the pending appeal to its advantage in negotiating the settlement. *Ibid.* Because the panel believed that there was a strong possibility that the settlement would have been different, if the matter had settled at all, but for the nondisclosure of the *Levine* appeal, the court concluded that "fairness and sound public policy dictate that plaintiff be denied the fruits of her counsel's conduct." *Id.* at 303, 926 *A.*2d 395. Therefore, the court set aside the settlement in order to "restore the essential elements of good faith and fair dealing, which are implicit parts of all contracts in this State." *Ibid.*

We granted certification to consider these issues, 192 *N.J.* 597, 934 *A.*2d 639 (2007), and we thereafter granted leave to the New Jersey State Bar Association (NJSBA) to appear as amicus curiae.

Having carefully considered the issues raised in the appeal, we now reverse.

## II.

Plaintiff argues that the appellate panel confused the disclosure obligations relevant to a motion for leave to appeal with those that pertain to an appeal as of right, pointing out that the CIS relied on by the panel plays no role in the former and is only filed as part of perfecting an appeal from a final order. Second, she argues that the panel inappropriately imposed a duty on her to conform to the *RPCs* rather than recognizing that those duties bind her attorney, and thus converted the duty, if any, that her attorney had, into an independent obligation on her part. In part, she argues that the panel both inappropriately penalized her solely because she happened to retain an attorney who had been involved in the *Levine* matter, creating, in the process, an entirely new class of conflicts of interest between counsel and client. Third, she disputes the panel's analysis of the *RPCs* and the meaning of "material fact" as it relates to adverse decisions of other courts. Finally, plaintiff argues that even if her attorney had been required to disclose the existence of the *Levine* litigation, and failed to do so, and even if that failure violated the *RPCs* and was a material fact, nothing in the record supported the extraordinary relief of setting aside the settlement reached between the parties for reasons entirely unrelated to that fact.

Defendant argues, on the contrary, that plaintiff has misperceived the reference by the appellate panel to the CIS, and that she has inappropriately focused on the incorrect *RPC* by relying on the duty of counsel to reveal contrary authority rather than the one that demands disclosure of material facts. Defendant argues that had Collins revealed the existence of the *Levine* appeal, the panel that considered the motion for leave to appeal in this matter would likely have granted that interlocutory relief. Further, defendant points out that Collins was not simply silent, but that he included in his original trial brief, which was part of the record

filed in connection with the motion for leave to appeal with the Appellate Division, an affirmative misstatement that "no New Jersey case" had held that cohabitation was a required element of the cause of action. Arguing that it was entirely appropriate for the panel to base its decision about the *RPC* violation in part on the "efficient utilization of judicial resources," defendant asserts that the panel correctly concluded that Collins violated his ethical obligations of candor to the tribunal here. Finally, defendant argues that because the settlement was based on Collins's failure to disclose the existence of the *Levine* matter, it simply cannot stand. Regardless of whether counsel's failure amounted to fraud, mistake, or simply inequitable conduct, defendant asserts that it is conduct that cannot be permitted to support a settlement.

The NJSBA contends that there is nothing in Collins's behavior that violated either the letter or the spirit of the applicable rules, asserting that his conduct as it relates to the matter falls well within the bounds of appropriate advocacy. In support of that conclusion, the NJSBA urges this Court to interpret the conduct proscribed by the *RPCs* narrowly, suggesting that the Court limit the requirement of disclosure to facts that have "major significance," or are "critically important to insuring fair and just judicial proceedings." Moreover, the NJSBA argues that because the *RPCs* are disciplinary rules, they should be understood and applied in that specific context rather than broadly read as a means to accomplish case management goals. Finally, the NJSBA urges this Court to reject the appellate panel's alternate condemnation of the behavior of this attorney as a "sharp practice," arguing that the information Collins possessed about the *Levine* litigation was of such minimal importance throughout the proceedings that it did not need to be disclosed.

### III.

This appeal requires us to consider not only an attorney's ethical obligations of candor to the tribunal, but the role to be played by our trial and appellate courts in matters before them

that are touched by an assertion that an attorney for a litigant has violated those rules. This question is complicated because there is a delicate balance to be achieved between an attorney's ethical obligations of candor, and the appropriate mechanism in place for addressing a violation thereof, and a litigant's right to zealous representation by an attorney of his or her choosing. It therefore requires us to consider the sources of law, ethics, and procedure that bear upon this issue, including the *RPCs,* the rules governing motions for leave to appeal, and our jurisprudence concerning the enforcement of settlement agreements.

### A.

We begin with a brief analysis of the *RPCs* that have been the focus of this appeal. Three subsections of *RPC* 3.3, entitled generally "Candor Toward the Tribunal," that are relevant to our consideration of the issues, provide as follows:

(a) A lawyer shall not knowingly:

(1) make a false statement of material fact or law to a tribunal;

. . . .

(3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel;

. . . .

(5) fail to disclose to the tribunal a material fact knowing that the omission is reasonably certain to mislead the tribunal, except that it shall not be a breach of this rule if the disclosure is protected by a recognized privilege or is otherwise prohibited by law.

We turn, then, to our analysis of the meaning of each of these provisions as they relate to the issues before us.

It bears repeating that, as a general proposition, the prohibitions set forth in these *RPCs* are not limited to affirmative misstatements of fact or law by an attorney. Indeed, we have recognized that, depending upon the circumstances, "silence can be no less a misrepresentation than words." *Crispin v. Volkswagenwerk, A.G.,* 96 *N.J.* 336, 347, 476 *A.*2d 250 (1984). Therefore, our evaluation of the attorney's discharge of his or her obligation is not simply a matter of considering the affirmative

statements and misstatements of counsel. Rather, if an attorney has an obligation to speak in order to comply with his or her duty of candor to the tribunal, then silence also may also be a violation of the *RPC.*

As among the first two of the three subparts of *RPC* 3.3(a) that are relevant to this matter, only a few observations are appropriate. First, subsection (a)(1) prohibits a lawyer from "mak[ing] a false statement of material fact or law to a tribunal...." We have ordinarily interpreted the scope and application of subsection (a)(1) to relate to a false statement of fact that is directly relevant to the particular litigation, either a fact in issue or a fact relating to a matter of procedure or the progress of the matter. *See, e.g., In re Lewis,* 138 *N.J.* 33, 33, 647 *A.2d* 469 (1994) (imposing discipline on attorney who introduced false document into evidence); *In re Breen,* 113 *N.J.* 522, 547–48, 552, 552 *A.2d* 105 (1989) (imposing discipline on attorney for making false statement about terms of lease and rent due and for misrepresentations about procedural posture of related matter); *Seacoast Builders Corp. v. Rutgers,* 358 *N.J.Super.* 524, 549, 818 *A.2d* 455 (App.Div. 2003) (imposing sanction on law firm for filing brief with inaccurate statements about assertions of attorney-client privilege). Although subsection (a)(1) also refers to a matter of law, because the only assertion is that the "matter of law" in question was the *Levine* decision, the complained-of behavior by this attorney falls more properly within (a)(3). Because we do not consider the information that Collins knew, but that he did not reveal, to be a matter of fact or of law as we have understood and interpreted to be required for application of this subsection of the *RPC,* we need not consider this subsection further.

Subsection (a)(3) speaks to a different issue, because it requires a lawyer to disclose court opinions and decisions that constitute "legal authority in the controlling jurisdiction," even if that authority is directly contrary to the interest of the client being represented by the attorney. The obligation to disclose case law, however, is limited somewhat by the impact of *Rule* 1:36–3, which

provides that "[n]o unpublished opinion shall constitute precedent or be binding upon any court." Even that limitation, however, is not unbounded, as an attorney who undertakes to rely on unpublished opinions that support his or her position must, in compliance with the duty of candor, also disclose contrary unpublished decisions known to the attorney as well. *R.* 1:36–3. Nevertheless, this *Rule* continues to define the demarcation line between opinions considered to be "binding" authority and other opinions, even though the latter, in many cases, are now readily available through the internet or through media outlets in printed format.

As it relates to the duty of candor to the tribunal, however, the scope of *RPC* 3.3(a)(3) is further impacted because our courts have recognized that the decision of one trial court is not binding on another, *see, e.g., State ex rel. R.M.,* 343 *N.J.Super.* 153, 156, 777 *A.*2d 1041 (Ch.Div.2001) (declining to follow another trial court's ruling that tinted windows alone did not provide sufficient suspicion to justify motor vehicle stop), *overruled in part on other grounds by State v. Cohen,* 347 *N.J.Super.* 375, 381, 790 *A.*2d 202 (App.Div.2002); *State v. Martes,* 266 *N.J.Super.* 117, 120, 628 *A.*2d 817 (Law Div.1993) (disagreeing with another trial court's determination that if a defendant intends only to joyride when entering a vehicle, then defendant cannot be convicted of burglary); *State v. Johnson,* 203 *N.J.Super.* 436, 438–41, 497 *A.*2d 242 (Law Div.1985) (declining to follow another trial court's decision that a pedal bicycle qualifies as a motor vehicle for driving while intoxicated purposes), nor, as a practical matter, is the decision of one appellate panel binding upon another panel of the Appellate Division, *see In re Patterson,* 382 *N.J.Super.* 366, 373, 889 *A.*2d 456 (App.Div.2006) (departing from another appellate panel's decision that external physical force is required to establish eligibility for accidental disability benefits), *rev'd on other grounds, Patterson v. Bd. of Trs., State Police Ret. Sys.,* 194 *N.J.* 29, 51, 942 *A.*2d 782 (2008); *David v. Gov't Employees Ins. Co.,* 360 *N.J.Super.* 127, 142, 821 *A.*2d 564 (App.Div.) (explaining that court was not bound by another appellate panel's decision, although nevertheless

following that decision), *certif. denied,* 178 *N.J.* 251, 837 *A.*2d 1094 (2003).

Both because the *Levine* decision was unpublished, and because it was the decision of a trial court, it was not "legal authority in the controlling jurisdiction" that Collins was obligated to call to the attention of either the Family Part judge or the appellate panel. Indeed, the panel specifically recognized that the attorney had no such obligation imposed upon him by this subsection of the *RPC. Brundage, supra,* 394 *N.J.Super.* at 295 n. 2, 926 *A.*2d 395.

### B.

The heart of the dispute, and the focus of the appellate panel's decision in this matter, is on *RPC* 3.3(a)(5), the third of the subsections that we have quoted. It is, therefore, essential that we consider the scope and meaning of this part of the *RPC* in some detail.

As one commentator has noted, *RPC* 3.3(a), in its current form, "bears little resemblance" to the ABA Model Rule on which it was initially based. *See* Kevin H. Michels, *New Jersey Attorney Ethics* 674 (2008). Not only did the language of the *RPC* depart from the Model Rule when it was initially adopted, but it has also been altered since that time. *Id.* at 674–75. The Debevoise Committee, which was the progenitor of these rules, had "recommended the adoption of the original version of [the ABA] *Model Rule* 3.3(a) without change." *Id.* at 674 (citing *Debevoise Committee Report,* 112 *N.J.L.J.,* July 28, 1983, *supp.* at 13); *see In re Seelig, supra,* 180 *N.J.* at 246–47, 850 *A.*2d 477 (discussing history of adoption and amendment of *RPC* 3.3(a)(5)). Following that recommended approach would have resulted in a rule that did not include any version of subsection (a)(5). This Court, in adopting the *RPCs,* however, modified the proposal of the Debevoise Committee relating to *RPC* 3.3(a) in two respects, one of which resulted in the inclusion of subsection (a)(5). Michels, *supra,* at 674. As adopted,

subparagraph (a)(5) has been added, which provides that attorneys shall not fail to disclose material facts that are likely to mislead the tribunal if counsel were to remain silent. This applies both to facts that are at issue in the case as well as facts relating to the management of the case. An attorney has an obligation to be candid and act with good faith toward the tribunal.

[*Ibid.* (quoting *Comment to RPC* 3.3, 114 *N.J.L.J.*, July 19, 1984, *supp.* at 8–9).]

In its initial articulation, therefore, *RPC* 3.3(a)(5) prohibited a knowing failure "to disclose to the tribunal a material fact with knowledge that the tribunal *may tend to be misled* by such failure." *RPC* 3.3(a)(5) (1984) (emphasis added). The inclusion of this provision has been called a "radical departure" from the *Model Rules, see* Michels, *supra,* at 674, because it imposed a new obligation on counsel that could not be "easily reconciled with the attorney's role as an advocate." *Ibid.*

The language of the *RPC* was immediately criticized for its breadth. *See ibid.;* Michael P. Ambrosio, *The "New" New Jersey Rules of Professional Conduct,* 11 *Seton Hall Legis. J.* 121, 138 (1987) (commenting on *RPC* 3.3(a)(5) as illustrative of the Court's adoption of a policy striving for absolute truth in place of adversarial presentations). Concerns about the scope of this *RPC's* "low threshold" for requiring an attorney to reveal information, and the impact that it would have on attorneys possessed of facts learned through client confidences in particular, led to a general reluctance to enforce it. *See* Michels, *supra,* at 674–75; Leslie C. Levin, *Testing the Radical Experiment: A Study of Lawyer Response to Clients Who Intend to Harm Others,* 47 *Rutgers L.Rev.* 81, 148 n. 303 (1994); *see also N.J. Advisory Comm. on Prof'l Ethics Opinion 643,* 125 *N.J.L.J.* 1358 (May 24, 1990) (expressing reluctance to require disclosure under *RPC* 3.3(a)(5) of material fact learned through client confidence even if it might possibly mislead tribunal).

Although much of the concern about this *RPC* was focused on the implicit requirement that an attorney disclose client confidences that would impact on a client's Fifth and Sixth Amendment rights in criminal proceedings, criticism of the broader implications of the *RPC* was not strictly limited to those matters.

Instead, this reluctance to require the disclosure of client confidences extended even to the realm of civil litigation, as to which no constitutional right of the client is impacted. *See* Ambrosio, *supra,* at 139. However, in spite of these criticisms, we have recognized that the *RPC* as adopted announced "a distinctive approach" to the concerns about the competing duties of all attorneys as between their obligations to their clients and their duty of candor to the tribunal. *In re Seelig, supra,* 180 *N.J.* at 249, 850 *A.*2d 477. As we have described it, our *RPCs* "shift the focus, in certain circumstances, from the client's interest to the legal system and the public interest." *Ibid.*

In 2001, this Court created the Commission on the Rules of Professional Conduct (the Pollock Commission) as an ad hoc Commission, and appointed retired Justice Stewart G. Pollock to serve as its chair. The Pollock Commission was charged with reviewing the *RPCs* in light of the then-recent work of the American Bar Association, much of the focus of which was on our ethical rules relating to the "appearance of impropriety" and the requirement that attorneys maintain a "bona fide office" in this State. New Jersey Supreme Court Commission on the Rules of Professional Conduct, *Final Report* 1 (Dec.2002) (hereinafter *"Pollock Report "*). As part of its general evaluation of the *RPCs,* the Pollock Commission engaged in a vigorous debate about *RPC* 3.3(a) in general and about *RPC* 3.3(a)(5) in particular. *Pollock Report, supra,* at 12–13. Although reporting that there was strong support for the elimination of *RPC* 3.3(a)(5), the Pollock Commission recommended in 2003 that it be retained without alteration. *Pollock Report, supra,* at 13. Notwithstanding that recommendation, in 2004, this Court amended the language of this subsection of the *RPC,* raising the threshold from "tend to mislead" to the current language of the rule, "reasonably certain to mislead." Supreme Court of New Jersey, *Administrative Determinations in Response to the Report and Recommendation of the Supreme Court Commission on the Rules of Professional Conduct* 58 (Sept. 10, 2003).

The difference in the language adopted by this Court is significant for our evaluation of this matter, because virtually all of the published decisions relating to the duties imposed on attorneys by this *RPC*, and all of those relied on by the Appellate Division in its decision here, arose in the context of the duties imposed by the former version rather than the language adopted in 2004. Our review, however, requires that we consider what Collins did, or failed to do, in light of the rule that actually was in effect at the time of the events in question.

We have previously discussed the general duty imposed on lawyers pursuant to this *RPC*. *See McKenney v. Jersey City Med. Ctr.*, 167 *N.J.* 359, 771 *A*.2d 1153 (2001). We have explained that duty in broad terms, stating: "Lawyers have an obligation of candor to each other and to the judicial system, which includes a duty of disclosure to the court and opposing counsel." *Id.* at 371, 771 *A*.2d 1153; *accord Kingsdorf v. Kingsdorf*, 351 *N.J.Super.* 144, 154, 797 *A*.2d 206 (App.Div.2002) (quoting *Davin, L.L.C. v. Daham*, 329 *N.J.Super.* 54, 76, 746 *A*.2d 1034 (App.Div.2000) to explain that "An attorney is not merely a hired gun, but, rather, a professional required to act with candor and honesty.").

Most recently, we have explained the genesis of this subsection of the *RPC*, and the policy concerns that support it, in a disciplinary matter involving an attorney who knew that his client was facing indictment but failed to reveal that information to a municipal court judge who was addressing related municipal charges. *See In re Seelig, supra*, 180 *N.J.* at 238–40, 850 *A*.2d 477. We concluded that the attorney's Sixth Amendment obligations to his client did not overcome his duty to disclose the pending indictable charges in an effort to secure a double jeopardy bar through the municipal court plea. In particular, we noted that the *RPCs* forbid "misrepresentation as a permissible litigation tactic, even when carried out in the name of zealous representation." *Id.* at 250, 850 *A*.2d 477. Moreover, we observed that *RPC* 3.3(a)(5) was intended to codify the notion that a failure to make a disclosure is, in some situations, the equivalent of an affirmative misrepresenta-

tion. *Id.* at 253, 850 *A.*2d 477; *see also In re Forrest,* 158 *N.J.* 428, 434–35, 730 *A.*2d 340 (1999) (finding a violation of *RPC* 3.3(a)(5) when an attorney failed to disclose to the arbitrator that one of the litigants had died); *In re Turner,* 83 *N.J.* 536, 539, 416 *A.*2d 894 (1980) ("[P]artial disclosures may at times result in misrepresentations due to the nondisclosure of material facts."). We nevertheless declined to impose any disciplinary sanction on that attorney, in large part because we concluded that "the attorney acted in good faith and the issue raised [was] novel." *In re Seelig, supra,* 180 *N.J.* at 257, 850 *A.*2d 477. Instead, we opted for the prospective application of our analysis and a strong warning to attorneys regarding what *RPC* 3.3 requires. *In re Seelig, supra,* 180 *N.J.* at 257, 850 *A.*2d 477.

## C.

Before we address the merits of the matter now before us, we are constrained to consider the procedural rules that relate to the particular way in which the appellate panel found that Collins fell short. The panel concluded that Collins had no ethical obligation to call the *Levine* decision, or its procedural posture, to the attention of the Family Part judge. *Brundage, supra,* 394 *N.J.Super.* at 295 n. 2, 926 *A.*2d 395. Instead, the sole basis for the Appellate Division's conclusion that counsel had violated *RPC* 3.3(a)(5) was his failure to alert the appellate panel that ruled on the motion for leave to appeal to the existence of the pending *Levine* appeal. *Id.* at 294, 926 *A.*2d 395. The panel interpreted *RPC* 3.3(a)(5) to impose on him "an affirmative duty to inform the appellate panel considering the motion for leave to appeal of a pending appeal involving a material issue, that was substantially similar or related to a material issue raised in the motion for leave to appeal in which the attorney was involved." *Ibid.* It found support for that duty in *Rule* 2:5–1(a), which requires disclosure of similar or related appeals in a party's CIS.

We turn, then, to a review of the standards that govern motions for leave to appeal. Under our rules, parties do not have a right

to appeal an interlocutory order. *In re Pa. R.R. Co.*, 34 *N.J.Super.* 103, 107–08, 111 *A.*2d 509 (App.Div.1955), *aff'd*, 20 *N.J.* 398, 120 *A.*2d 94 (1956); *see R.* 2:2–3. Rather, leave to file an interlocutory appeal of a trial court's order is permitted only "in the interest of justice." *R.* 2:2–4. A similar standard applies to this Court's review of interlocutory orders. *See R.* 2:2–2(b) (providing that this Court may take appeals from interlocutory orders to "prevent irreparable injury").

The rationale that supports this stringent standard may be found in our general policy against piecemeal review of trial-level proceedings. *See State v. Reldan*, 100 *N.J.* 187, 205, 495 *A.*2d 76 (1985). As our Appellate Division has recognized, an interlocutory appeal is not appropriate to "correct minor injustices...." *Romano v. Maglio*, 41 *N.J.Super.* 561, 567, 125 *A.*2d 523 (App.Div.), *certif. denied*, 22 *N.J.* 574, 126 *A.*2d 910 (1956), *cert. denied*, 353 *U.S.* 923, 77 *S.Ct.* 682, 1 *L.Ed.*2d 720 (1957). Rather, when leave is granted, it is because there is the possibility of "some grave damage or injustice" resulting from the trial court's order. *Id.* at 568, 125 *A.*2d 523. Alternatively, leave may be granted "where the appeal, if sustained, will terminate the litigation and thus very substantially conserve the time and expense of the litigants and the courts...." *Ibid.* As an example, leave to appeal may be appropriate if it will resolve a fundamental procedural issue and thereby prevent the court and the parties from embarking on an improper or unnecessary course of litigation. *See Dinizo v. Butler*, 315 *N.J.Super.* 317, 319, 718 *A.*2d 251 (App.Div.1998). Regardless of the specific basis asserted, however, the moving party must establish, at a minimum, that the desired appeal has merit and that "justice calls for [an appellate court's] interference in the cause." *Romano, supra*, 41 *N.J.Super.* at 568, 125 *A.*2d 523.

The Appellate Division enjoys considerable discretion in determining whether the "interest of justice" standard has been satisfied and, as a result, whether to grant a motion for leave to file an interlocutory appeal. *See Edwards v. McBreen*, 369

N.J.Super. 415, 420, 849 A.2d 204 (App.Div.2004); *Bass ex rel. Will of Bass v. DeVink*, 336 N.J.Super. 450, 454, 765 A.2d 247 (App.Div.), *certif. denied*, 168 N.J. 292, 773 A.2d 1156 (2001). The Appellate Division has, for example, granted review of interlocutory orders that actually or effectively dismiss a party's claims or defenses. *See, e.g., Fid. Union Bank v. Hyman*, 214 N.J.Super. 177, 179, 518 A.2d 764 (App.Div.1986); *Hamilton v. Letellier Constr. Co.*, 156 N.J.Super. 336, 337, 383 A.2d 1168 (App.Div.1978). It has also granted leave to review orders concerning novel questions of law, *see, e.g., Arena v. Saphier*, 201 N.J.Super. 79, 81, 492 A.2d 1020 (App.Div.1985), matters relating to questions of privilege, *see, e.g., Coyle v. Estate of Simon*, 247 N.J.Super. 277, 280, 588 A.2d 1293 (App.Div.1991), and issues of constitutional magnitude, *see, e.g., Bd. of Educ. v. Caffiero*, 173 N.J.Super. 204, 206–08, 413 A.2d 981 (App.Div.1980), *aff'd*, 86 N.J. 308, 431 A.2d 799 (1981). Although the Appellate Division has also granted leave for review of orders denying certification of a class action, *see, e.g., Lusky v. Capasso Bros.*, 118 N.J.Super. 369, 371, 287 A.2d 736 (App.Div.), *certif. denied*, 60 N.J. 466, 291 A.2d 16 (1972), a trial judge's denial of an attorney's application to withdraw from representation, *see, e.g., Jacobs v. Pendel*, 98 N.J.Super. 252, 254, 236 A.2d 888 (App.Div.1967), and has even intervened to resolve certain discovery disputes, *see, e.g., Klimowich v. Klimowich*, 86 N.J.Super. 449, 450, 207 A.2d 200 (App.Div.1965), these circumstances have been rare. In light of these standards, the power to grant leave is "exercised only sparingly...." *Reldan, supra*, 100 N.J. at 205, 495 A.2d 76.

## D.

Finally, it is significant to our evaluation of this appeal to recognize that the appellate panel's ultimate order effectively overturned a settlement entered into by the parties following the panel's denial of the motion for leave to appeal. We address, then, the law governing settlements as it bears on our analysis. "Generally, a settlement agreement is governed by principles of con-

tract law." *Thompson v. City of Atl. City,* 190 *N.J.* 359, 379, 921 *A.*2d 427 (2007). Fundamental to our jurisprudence relating to settlements is the principle that "[t]he settlement of litigation ranks high in our public policy." *Jannarone v. W.T. Co.,* 65 *N.J.Super.* 472, 476, 168 *A.*2d 72 (App.Div.), *certif. denied,* 35 *N.J.* 61, 171 *A.*2d 147 (1961); *see Pascarella v. Bruck,* 190 *N.J.Super.* 118, 125, 462 *A.*2d 186 (App.Div.) (quoting *Jannarone, supra,* 65 *N.J.Super.* at 476, 168 *A.*2d 72), *certif. denied,* 94 *N.J.* 600, 468 *A.*2d 233 (1983).

Our strong policy of enforcing settlements is based upon "the notion that the parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone." *Peskin v. Peskin,* 271 *N.J.Super.* 261, 275, 638 *A.*2d 849 (App.Div.) (quoting *Dep't of Pub. Advocate v. N.J. Bd. of Pub. Util.,* 206 *N.J.Super.* 523, 528, 503 *A.*2d 331 (App.Div.1985)), *certif. denied,* 137 *N.J.* 165, 644 *A.*2d 613 (1994). In furtherance of this policy, our courts "strain to give effect to the terms of a settlement wherever possible." *Dep't of Pub. Advocate, supra,* 206 *N.J.Super.* at 528, 503 *A.*2d 331. As we have held, settlements will usually be honored "absent compelling circumstances." *Nolan v. Lee Ho,* 120 *N.J.* 465, 472, 577 *A.*2d 143 (1990). "An agreement to settle a lawsuit is a contract, which like all contracts, may be freely entered into and which a court, absent a demonstration of 'fraud or other compelling circumstances,' should honor and enforce as it does other contracts." *Pascarella, supra,* 190 *N.J.Super.* at 124–25, 462 *A.*2d 186 (quoting *Honeywell v. Bubb,* 130 *N.J.Super.* 130, 136, 325 *A.*2d 832 (App.Div.1974)). However, "[i]f a settlement agreement is achieved through coercion, deception, fraud, undue pressure, or unseemly conduct, or if one party was not competent to voluntarily consent thereto, the settlement agreement must be set aside." *Peskin, supra,* 271 *N.J.Super.* at 276, 638 *A.*2d 849; *see also Nolan, supra,* 120 *N.J.* at 472, 577 *A.*2d 143.

Part of our inquiry, therefore, must focus on whether the ethical violation of the attorney, if any, sufficed to support the decision of

the appellate panel to set aside the settlement of the litigation or whether that settlement was nevertheless entitled to be enforced in accordance with these principles.

## IV.

We have long recognized that there is an inherent tension between an attorney's duty of candor to the tribunal and that same attorney's duty to be a zealous advocate for his or her client. *See In re Greenberg,* 15 *N.J.* 132, 138, 104 *A.*2d 46 (1954). Our *RPCs* have drawn a line that is the demarcation between conduct that is acceptable and that which is not. Conduct that falls on the wrong side of that line, even if well-intentioned, subjects the attorney to discipline and, in an appropriate case, calls for the imposition of sanctions in the case in which the behavior occurs.

It is significant to our analysis of this matter to note that the overwhelming majority of decisions relating to our *RPCs* and their meaning are matters arising in the context of attorney discipline. In those matters, the jurisdiction of this Court is plenary, *N.J. Const.* art. VI, § II, ¶ 3; *In re Greenberg,* 155 *N.J.* 138, 152, 714 *A.*2d 243 (1998), *cert. denied,* 526 *U.S.* 1132, 119 *S.Ct.* 1807, 143 *L.Ed.*2d 1011 (1999), and the punishment for the behavior that violates one or another of our rules governing attorneys' conduct falls directly on the offending member of the bar. In contrast, the number of situations in which the effect of an attorney's behavior has been considered outside of the context of our disciplinary system have been few, and with good reason. This Court has been reluctant, and rightly so, to visit the offenses of the attorney on his or her innocent client, preferring to enforce our rules with punishment that instead affects only the offending attorney. *Kosmowski v. Atl. City Med. Ctr.,* 175 *N.J.* 568, 575–76, 818 *A.*2d 319 (2003).

To be sure, we have encountered situations in which it is appropriate to permit reference to a violation, or a claimed violation, of the *RPCs* in a case in chief, but those have been relatively rare. We have declined to create a new tort-based

cause of action against an attorney based on a claim by an adversary of an asserted violation of our *RPCs*, while permitting the introduction of that evidence to support an inference of a breach of that attorney's duty of care to the third party. *See Baxt v. Liloia*, 155 *N.J.* 190, 199–200, 714 *A.*2d 271 (1996). Even there, the offending attorney was the focus of the extra-disciplinary sanction. *See id.* at 210–11, 714 *A.*2d 271. Similarly, our Appellate Division has imposed sanctions on a law firm for what it found to be the advocate's false assertions of facts. *Seacoast Builders Corp., supra*, 358 *N.J.Super.* at 549, 818 *A.*2d 455. There, too, the court's order was directed to the attorney's law firm rather than to his client.

We have traditionally, therefore, separated the unethical acts of the attorney from the cause of action of his or her client. In doing so, we have not demonstrated tolerance for the bad acts of the attorney but have shown only our preference for penalizing an attorney through our disciplinary system, *see generally Boston Univ. v. Univ. Med. & Dentistry of N.J.*, 176 *N.J.* 141, 147, 820 *A.*2d 1230 (2003) (considering ethics implications separately from the underlying issues, but declining to refer matter to ethics authorities for imposition of discipline), rather than for visiting punishment upon an entirely innocent client for the attorney's acts. In fact, we have reversed the decision of a trial court imposing the sanction of dismissal with prejudice based on an attorney's false assertion to the tribunal in preference for a sanction to be visited directly on the attorney rather than on the innocent client. *Kosmowski, supra*, 175 *N.J.* at 575–76, 818 *A.*2d 319. In light of all of these principles, we consider the facts and circumstances in the record on appeal, together with the specific basis on which the appellate panel found it appropriate to act.

A.

We begin with the observation that we have not in the past, and we do not now, approve of what have generally been referred to as "sharp practices," which are tactics employed by some members of

the bar that are not explicitly unethical but nonetheless tread perilously close to the line of being unacceptable. Our courts have long expressed a distaste for such practices, *see, e.g., Rapczynski v. Eagle Inv. Co.*, 12 *N.J. Misc.* 801, 806, 175 *A.* 560 (Ch. Ct.1934) (condemning act that "smacks of sharp practice and creates a bad taste"); *W. Ridgelawn Cemetery v. Jacobs*, 108 *N.J. Eg.* 513, 516 (Ch. Ct.1931) (referring to "sharp practices" that courts "ought not . . . countenance, especially where it results in such apparent injustice"), and the modern counterparts to those practices are neither to be praised nor applauded. *See, e.g.,* Howard Vogel, *The Terrible Bind of the Lawyer in the Modern World: The Problem of Hope, the Question of Identity, and the Recovery of Meaning in the Practice of Law*, 32 *Seton Hall L.Rev.* 152, 157–58 (2001) (describing despair-induced decision by attorneys to engage in "Rambo" tactics); Donna C. Chin et al., *Symposium: One Response to the Decline of Civility in the Legal Profession: Teaching Professionalism in Legal Research and Writing*, 51 *Rutgers L.Rev.* 889, 891–92 (1999) (suggesting that civility in writing can decrease lack of civility in litigation); Robert N. Saylor, *Rambo Litigation: Why Hardball Tactics Don't Work, A.B.A.J.*, Mar. 1, 1988, at 79 (describing increasing trend toward "hardball" or "Rambo" tactics in litigation).

We have long participated, in cooperation with our federal counterparts and the NJSBA, in the New Jersey Commission on Professionalism in the Law, which has adopted the Principles of Professionalism to which we have subscribed. Through that cooperative effort, we have supported programs for the bench and bar designed to celebrate and strengthen the noblest among us and encourage others to follow their lead. That the *RPCs* allow conduct that falls short of our loftier aspirations does not require us to applaud or encourage anyone who seeks comfort in knowing that one practice or another is merely not prohibited. Regardless of our view, however, of such behaviors, we first consider, as we must, whether this attorney's conduct actually violated any of the applicable *RPCs* and whether the sanction imposed by the appellate panel was appropriate.

In this matter, the appellate panel first concluded that nothing in the attorney's behavior violated any duty owed by him under the *RPCs* to the Family Part. Recognizing that the unpublished trial level *Levine* decision was not binding on that judge, the panel reasoned that it was not "legal authority" that the attorney was required to disclose. *See RPC* 3.3(a)(3). Applying like logic, the panel similarly concluded that neither the existence of the trial court decision, nor the pending appeal from that decision, constituted a matter of fact or law about which the attorney's failure to disclose was a misstatement. *See RPC* 3.3(a)(1).

We agree with each of these propositions; the attorney's conduct simply did not violate either of these provisions of *RPC* 3.3(a). As it relates to the attorney's duty of candor in the Family Part, the panel also found no violation of *RPC* 3.3(a)(5), even though one of the four statements in the brief in opposition to the motion to dismiss omitted the otherwise carefully placed qualifying language about "published" opinions and "precedent" and, as a result, was not completely truthful. Although standing alone, that unqualified assertion could fairly be characterized as a misstatement, seen in the context of the entire brief, and of the record as a whole, we consider it to have been an unintentional oversight.

In part, we reach this conclusion because we cannot say that the attorney, in failing to disclose the existence of the *Levine* decision or its pending appeal, knew "that the omission [was] reasonably certain to mislead the tribunal." *RPC* 3.3(a)(5). Although we do not intend to suggest that, when this Court revised the language of this *RPC* to elevate the threshold from "may tend to mislead" to its current language, we meant to cloak carefully shaded, cleverly worded briefs that reveal the "truth" while disguising the "whole truth," we recognize, as we must, that the threshold imposed by the *RPC* was altered. Applying that *RPC* to this attorney's effort at careful wording to avoid disclosing the *Levine* decision when he opposed the motion to dismiss, we cannot conclude that there was a "reasonabl[e] certain[ty]" that the

Family Part judge would be misled. To be sure, taken together the one misstatement and the repeated, strident phrasing, come perilously close to an intention to mislead the Family Part judge; it is that orchestrated behavior we have found sufficiently troubling to be criticized. Nevertheless, there is no suggestion that the Family Part judge actually was misled. There is a record created before that judge, in connection with the motion to set aside the settlement, and it contains no support for the proposition that, had he been aware of the existence of the *Levine* matter, it would have had any impact on his decision on the merits of the motion to dismiss.

In its evaluation, the appellate panel did not focus, however, on the conduct of the attorney as it related to the Family Part, looking instead only to his conduct in connection with the motion for leave to appeal. In evaluating that conduct, and in finding a violation of the *RPC* that became the springboard for its decision to set aside the settlement, the panel found support for its conclusion in the disciplinary decisions of this Court and in *Rule* 2:5–l(a). Our analysis, however, of those bases for the panel's decision, leads us to a different result.

First, our disciplinary decisions, by and large, rely on the earlier, "may tend to mislead" version of *RPC* 3.3(a)(5), rather than the "reasonably certain to mislead" standard now embodied in that *RPC*. As our analysis of the meaning of that language in the context of the attorney's obligation of candor to the Family Part reveals, the difference is significant.

Second, when we consider whether Collins had an obligation, consistent with the *RPC*, to reveal the existence of the then-pending *Levine* appeal to the appellate panel that was considering the motion for leave to appeal, we must conclude that he did not. And, when we evaluate whether his failure to do so was "reasonably certain to mislead" the appellate judges considering that motion, we must conclude that it did not. We reach these conclusions for several reasons. To begin with, the *Rule* requiring preparation and filing of a CIS in connection with an appeal does

not apply to a motion for leave to appeal but only relates to an attorney's obligation in perfecting an appeal. *See R.* 2:5–1(a). Although an attorney seeking leave to appeal might well find it helpful to that effort if he or she can point to the existence of a similar, pending appeal, nothing in the *Rules* requires an attorney to reveal that information as part of a motion for leave to appeal or in a brief opposing another attorney's motion for leave to appeal. By the same token, although the appellate panel believed that information relating to other, similar appeals, was already required to be disclosed by way of a CIS even in connection with a motion for leave to appeal, much of the information that the CIS reveals would not be relevant in the context of a motion for leave to appeal. Nevertheless, further consideration by the Presiding Judge for Administration of the Appellate Division about creation of a suitable mechanism for disclosure of this information in the future, or about an appropriate proposed amendment to our *Rules* to effect this goal might be well advised.

However, in the absence of such a requirement, the suggestion that Collins had a duty to reveal this information rests on the implicit assumption that, had he done so, the appellate panel would have granted the motion for leave to appeal. As we have explained, the standards governing grants of interlocutory review are stringent, *see Reldan, supra,* 100 *N.J.* at 205, 495 *A.*2d 76, and that leave is sparingly granted, *see Romano, supra,* 41 *N.J.Super.* at 567–68, 125 *A.*2d 523. Our appellate courts do not routinely grant leave to appeal nor do our rules contemplate a system in which interlocutory appeals function as a mechanism that will merely promote efficiency in the administration of justice. On the contrary, our system recognizes that there will be different decisions as to novel issues of law reached by our trial judges, and that these decisions will be considered by our Appellate Division in the ordinary course. Our system of justice does not contemplate the accumulation of all matters raising a novel issue of law into a single appeal nor does it suggest that it is appropriate, in effect, to impose a moratorium on our trial judges once a single judge's decision on an issue has become the subject of an appeal.

■ Seen in this light, there is nothing in the record that suggests that knowledge of the existence of the *Levine* appeal would have vaulted the otherwise unexceptional motion for leave to appeal over the "interest of justice" threshold into the realm of a motion that would have been granted. Nothing in the record suggests that the panel considering this motion would have found this pending issue so novel or so compelling that it would have elected to cumulate it with the *Levine* matter instead of leaving it pending in the Family Part for resolution by trial or by settlement. In the absence of a conclusion that knowledge of the *Levine* appeal would likely have had such an impact on the motion, we cannot conclude that the attorney's election to carefully word his brief so as to sidestep revealing it actually violated *RPC* 3.3(a)(5).

We reach a conclusion contrary to that of the appellate panel for an additional, entirely separate, reason. The panel, having concluded that the attorney's conduct fell short of what the *RPC* required, but recognizing that it was not empowered to impose discipline, determined to impose a sanction instead. The sanction that it chose was an order setting aside the settlement reached by the parties after the denial of the motion for leave to appeal. In deciding to impose that sanction, the panel reasoned that knowledge of the existence of the *Levine* appeal might have altered the decision of defendant to settle or might have affected the terms of the settlement. The panel concluded that "fairness and sound public policy" demanded that the plaintiff be deprived of the fruits of that settlement.

■ Again, our analysis directs us to adopt a different course. First and foremost, applying our ordinary rules regarding settlements and their enforcement, *see Nolan, supra,* 120 *N.J.* at 472, 577 *A.*2d 143; *Pascarella, supra,* 190 *N.J.Super.* at 124–25, 462 *A.*2d 186, there is no evidence that demands that the settlement be set aside. Plaintiff herself had no knowledge about the pending appeal, and although the duty of good faith and fair dealing applies to settlements as it does to any other contract, *see*

*Sons of Thunder, Inc. v. Borden,* 148 *N.J.* 396, 420, 690 *A.*2d 575 (1997), we cannot say that this duty requires either side in negotiations to reveal any and all information that might help the adversary and hurt his or her own client. Rather, we have found an obligation requiring candor between adversary counsel on more limited grounds, and arising from the dictates of *RPC* 3.4, in circumstances that do not apply, and were not considered, here. *See, e.g., McKenney, supra,* 167 *N.J.* at 371, 771 *A.*2d 1153 (citing *Kernan v. One Washington Park Urban Renewal Assocs.,* 154 *N.J.* 437, 461–67, 713 *A.*2d 411 (1998) (Pollock, J., concurring)); *cf. Liguori v. Elmann,* 191 *N.J.* 527, 551, 924 *A.*2d 556 (2007). Moreover, the Family Part judge who denied the motion to set the settlement aside found, as a matter of fact, that defendant had not carried its burden of demonstrating that the settlement would not have been reached or would have been materially different. That finding was entitled to deference, *see Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974), and nothing in the attorney's contrary assertion in his certification on appeal overcame it. Indeed, such an assertion of fact, not within the knowledge of the affiant, is insufficient to prove the factual matter asserted. *See, e.g., Jameson v. Great Atl. & Pac. Tea Co.,* 363 *N.J.Super.* 419, 427, 833 *A.*2d 626 (App.Div.2003), *certif. denied,* 179 *N.J.* 309, 845 *A.*2d 134 (2004); *Venner v. Allstate,* 306 *N.J.Super.* 106, 111, 703 *A.*2d 330 (App.Div.1997); *Cafferata v. Peyser,* 251 *N.J.Super.* 256, 263–64, 597 *A.*2d 1101 (App.Div.1991); *Murray v. Allstate Ins. Co.,* 209 *N.J.Super.* 163, 169, 507 *A.*2d 247 (App.Div.1986).

More to the point, however, in deciding to set aside the settlement, the panel opted to penalize the offending attorney's client rather than to impose a sanction on the attorney directly. That choice was explicitly based on the panel's entirely correct recognition that it lacked the power to discipline the attorney. Discipline of attorneys is a matter left to this Court and to the separate bodies that we have authorized to assist us in that endeavor. We cannot escape that in these circumstances, the

panel attempted to punish the client only because it found the attorney's behavior offensive. Attempting to enforce the *RPCs* through imposition of sanctions on a client, however, is simply outside of the role of the trial and appellate courts; they are not free to impose their own notions of discipline in place of our plenary authority.

Clearly, the trial and appellate courts have the power to impose sanctions on attorneys; they have the inherent power to do so as a means to enforce our ordinary rules of practice and discovery. *See, e.g., R.* 1:2–4 (sanctions for failure to appear and file conforming motions and briefs); *R.* 1:4–8 (sanctions for frivolous litigation); *R.* 4:23–1 to –5 (discovery sanctions); *Abtrax Pharm., Inc. v. Elkins–Sinn, Inc.,* 139 *N.J.* 499, 513, 655 *A.*2d 1368 (1995) (recognizing inherent power of courts to punish discovery violations); *Triffin v. Automatic Data Processing, Inc.,* 394 *N.J.Super.* 237, 251–53, 926 *A.*2d 362 (App.Div.2007) (recognizing power of courts to remedy fraud on the court). Just as plainly, our trial and appellate courts are empowered to utilize their contempt power in appropriate circumstances. *See R.* 1:10–1.

Notwithstanding those considerable powers, the trial courts must be careful not to use the sanction power in circumstances when the contempt mechanisms are the appropriate remedy. *See Wolfe v. Malberg,* 334 *N.J.Super.* 630, 636–37, 760 *A.*2d 812 (App.Div.2000) (imposing limitations on sanction power if procedures for contempt should have been implicated); *In re Duane, Morris & Heckscher LLP,* 315 *N.J.Super.* 304, 316–17, 718 *A.*2d 244 (App.Div.1998) (setting aside monetary sanction where contempt proceeding should have been utilized). Similarly, our trial and appellate courts may not use those powers to address behavior that should be considered in the context of our disciplinary rules. Nor should they ordinarily visit their sanctions on the entirely innocent client of the attorney deserving of reproach.

The circumstances in which a sanction is appropriate in place of discipline have been exceedingly rare, *see Baxt, supra,* 155 *N.J.* at 199–200, 714 *A.*2d 271; *Seacoast Builders Corp., supra,* 358

*N.J.Super.* at 549, 818 *A.*2d 455, and we have never endorsed the use of a sanction to be visited on the client as a means to discipline that client's attorney. More importantly, we cannot agree that it was appropriate to punish this client for her attorney's conduct because that conduct, although perhaps troublingly sharp, nonetheless did not violate any of our ethical proscriptions.

### B.

This matter serves as an unfortunate example of an attorney hoping to gain an advantage for his client by withholding or by carefully shading the truth about facts he, but neither his adversary nor the court, knew. The question is what, if any, remedy there is to be afforded in the context of the motion to set aside the settlement or the appeal from the trial court's denial of that application for relief.

First, Collins knew that the *Levine* decision at the trial level was not in his favor and he also knew that an appeal as of right was then pending. We accept as true that his adversary did not know and could not have known what Collins knew because the trial level decision was not published and, although it was a matter of first impression, it apparently had not been reported in the popular press or in any publications relied on by members of the bar. Nor, for that matter, could the adversary have learned about the substance of the pending appeal, because there was no searchable database for unreported opinions available at the time. Indeed, even the Appellate Division judges to whom the motion for leave to appeal was assigned were not aware that the key question in the matter was then pending before an appellate panel. The question, then, is whether Collins had a duty to reveal the outcome or status of the *Levine* matter to his adversary, to the trial court that considered his opposition to the motion to dismiss, or to the appellate panel that considered the motion for leave to appeal. Simply put, although we view Collins's behavior as a rather carefully orchestrated effort not entitled to our praise or our

encouragement, we cannot conclude that it called for the remedy imposed by the appellate panel.

We reach this conclusion for several policy based considerations as well. First, if we were to conclude that an attorney has an affirmative duty to advise his adversary or the court of every unpublished adverse ruling against him, we would create a system in which a single adverse ruling would be the death knell to the losing advocate's practice. And it would be so even if the first adverse ruling eventually were overturned by the appellate panel or by this Court. Such a system would result in a virtual quagmire of attorneys being unable to represent the legitimate interests of their clients in any meaningful sense. It would not, in the end, advance the cause of justice because the first decision on any issue is not necessarily the correct one; the first court to speak is just as likely to be incorrect in novel or unusual matters of first impression as it is to be correct.

Second, if we were to agree that the panel's response to this attorney's behavior is appropriate, we would necessarily be concluding that each time a decision on a new issue is made at the trial level and is pursued on appeal, all similar issues must await that outcome. The appellate panel here apparently concluded that, if Collins had revealed, in the papers opposing his adversary's motion for leave to appeal, that the matter was then pending in another appeal, the motion for leave would have been granted. Yet, nowhere in our rules is there a suggestion that the existence of a pending matter, that raises the same issue, provides an adequate ground for a motion for leave to appeal. Nor would this be preferable to the current system of justice in which different trial level judges address issues, each bringing his or her own views and analysis to the process, and continuing until the Appellate Division or this Court has spoken in a manner that settles the issue. The implicit suggestion of the appellate panel here is that once the first court, published or not, has spoken, the issue is ended, at least as far as the attorneys who have the luck or misfortune to know about it are concerned.

Third, we must also recognize that parties enter into settlements for many reasons. Courts routinely enforce those settlements even in the face of changed minds or changes in the law that would otherwise govern the substance of the matter. Absent a demonstration that a settlement was procured by fraud or some similarly compelling reason, we have long been reluctant to set it aside. More to the point, we routinely rely on the trial court judge to decide whether a particular settlement should be enforced or set aside. The Family Part judge considered the arguments of counsel about the facts that Collins knew and his adversary did not. That judge concluded that whatever might be said about Collins and his behavior, it did not amount to fraud. Because of its own view that the behavior was worthy of opprobrium, the appellate panel overlooked its usual deference to that decision-maker and relied on the assertion of defendant's attorney about whether the parties would have settled had the existence of the *Levine* appeal been known. In accepting as true the assertion that this fact, alone in the complex matrix of factors that made up the settlement in this matter, would have motivated defendant not to settle at all, the panel effectively made a better agreement for one party than the one in which it engaged.

Finally, we reach this result for a reason perhaps unique to this particular matter. In the final analysis, the *Levine* opinion has proven to be the incorrect one and this Court has now spoken on the question conclusively and in accordance with the view that the trial court in this case expressed. *See Devaney v. L'Esperance,* 195 *N.J.* 247, 949 *A.*2d 743 (2008) (concluding that cohabitation is an important, but not necessary, factor in a palimony cause of action). Although that might be nothing more than a lucky break for Collins and his client, overturning this particular settlement would serve no purpose, because the law as inaccurately perceived by defendant at the time of the settlement, has proven to be the correct interpretation.

In short, sharp practices and "playing fast and loose" with the rules that govern our profession are behaviors entitled to our

stern condemnation. When such behavior amounts to a violation of the *RPCs,* it calls for disciplinary sanctions on an attorney, and, in an appropriate case, might call for sanctions on an attorney other than the imposition of discipline itself. In the end, however, the penalty to be imposed should, in fairness to our adversarial system, be visited on the attorney and not on the client. By imposing a penalty on a client, which the panel intended to be an act of discipline, the panel erred.

## V.

The judgment of the Appellate Division is reversed and the order of the Family Part enforcing the settlement is reinstated.

Justice ALBIN, concurring.

I agree with the majority that plaintiff's attorney did not violate our court rules or our *Rules of Professional Conduct (RPCs)* by not disclosing to the Family Part judge and his adversary the unreported trial court decision in *Levine v. Konvitz.* I agree with the majority that plaintiff's attorney did not violate our court rules or our *RPCs* by not disclosing to the Appellate Division that *Levine v. Konvitz* was on direct appeal at the time defendant filed the motion for leave to appeal. I agree with the majority that the settlement in this case should not be disturbed.

I cannot agree, however, that plaintiff's attorney deserves to be publicly castigated by this Court because, in compliance with our court rules and the *RPCs,* he did not disclose knowledge about an unpublished trial court decision that would have been harmful to his client's case. Plaintiff's attorney has a duty of zealous advocacy on behalf of his client within the acceptable bounds of professional behavior. *See State ex rel. S.G.,* 175 *N.J.* 132, 138, 814 *A.*2d 612 (2003) (discussing attorney's " 'duty of loyalty to his or her clients' " (quoting *In re Opinion No. 653 of the Advisory Comm. on Prof'l Ethics,* 132 *N.J.* 124, 129, 623 *A.*2d 241 (1993))). Indeed, *RPC* 1.3 commands that "[a] lawyer shall act with reasonable diligence ... in representing a client." I cannot imagine that any

client would believe that her attorney acted with "reasonable diligence" if that attorney—without any legal or ethical obligation—handed over information to the adversary that undermined the client's case.

If an attorney, who protects the interests of his client within the bounds of our codified rules of professional conduct, is to be condemned for " 'playing fast and loose' with the rules" and for engaging in "sharp practices" and behavior "worthy of reproach," *ante* at 613, 951 *A.*2d at 969, then we owe it to the bar to set forth precisely what he did to merit this judicial pillory. If the majority believes that, in the future, attorneys should be required to disclose to their adversaries and the court their knowledge of unpublished trial court decisions that are inconsistent with their clients' positions, then it should say so, and the bar can act accordingly.

However close plaintiff's attorney came to the line separating professional from unprofessional conduct, he did not cross the line demarcated by our court rules and *RPCs*. I do not encourage attorneys to dance close to that line. Nevertheless, plaintiff's attorney should not be publicly rebuked when, by the majority's own account, he did not violate the rules of court and professional conduct, and abided by his duty of loyalty to his client, but yet crossed the line of some unwritten code of behavior to which the majority subscribes.

Otherwise, I respectfully concur with the well-reasoned opinion of the majority.

Justice WALLACE joins in this opinion.

*For reversal and reinstatement*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.